**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**ANTHONY LAMAR HARDY,**

        **Petitioner,**

**vs.**                                    **Case No. 4:13cv137-RH/CAS**

**JULIE L. JONES, SECRETARY,
FLORIDA DEPARTMENT OF CORRECTIONS,[1]**

        **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY AMENDED § 2254 PETITION

On March 19, 2013, Petitioner Anthony Lamar Hardy, proceeding pro se, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Doc. 1. Respondent filed an answer, with exhibits. Doc. 17. Petitioner subsequently filed an amended § 2254 petition. Doc. 22. Respondent filed an answer to the amended petition on July 22, 2014, with additional exhibits. Doc. 24. Petitioner filed a reply on July 31, 2014. Doc. 26.

---

[1]The Clerk of Court shall substitute Julie L. Jones as Secretary of the Florida Department of Corrections in place of Michael D. Crews. Julie Jones became Secretary on January 5, 2015, and shall be automatically substituted pursuant to Federal Rule of Civil Procedure 25(d).

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B). After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this matter. *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts. For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and the amended § 2254 petition should be denied.

## State Court Proceedings

By information filed January 18, 1991, the State of Florida charged Petitioner Anthony Lamar Hardy with four counts in the Second Judicial Circuit, Gadsden County, case number 91-CF-33, in connection with events that took place on or about January 3, 1991, at Pat's Grocery, a convenience store: one count of attempted armed robbery with a firearm, in violation of section 812.13(2)(a), Florida Statutes, and three counts of attempted first degree murder with a firearm, in violation of sections 777.04 and 782.04(1), Florida Statutes. Doc. 17 Ex. A at 5-6. Hardy proceeded to a jury trial on August 5 and 6, 1991, during which he testified. Doc. 17 Ex. E at 101-29. The jury found him guilty as charged, specifically finding "with a firearm" on each count. *Id.* at 213-14; Ex. A at 33-36. On August 16, 1991, the state trial court sentenced him to 30 years in prison on the first count and to life in prison on each of the other counts, with all terms concurrent. *Id.* Ex. A at 42-48; Ex. F at 9.

Hardy appealed his conviction and sentence to the First District Court of Appeal (DCA), assigned case number 1D91-2786. *Id.* Ex. J. The First DCA per curiam

affirmed the case without an opinion on February 5, 1993, and the mandate issued February 23, 1993. <u>Hardy v. State</u>, 613 So. 2d 15 (Fla. 1st DCA 1993).

On August 9, 1994, Hardy filed a motion for post conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. Doc. 17 Ex. L at 1-51. The State filed a response. *Id.* at 52-59. The state trial court summarily denied the motion by order rendered February 14, 1996. *Id.* at 60-64. Hardy appealed to the First DCA, assigned case number 1D96-905, and that court per curiam affirmed the case without a written opinion on September 12, 1996. <u>Hardy v. State</u>, 680 So. 2d 427 (Fla. 1st DCA 1996). The mandate issued September 30, 1996. Doc. 17 Ex. M.

On March 4, 1997, Hardy filed another Rule 3.850 motion. Doc. 24 Ex. N at 1-12. The State filed a response. *Id.* at 58-63. The state trial court summarily denied the motion by order rendered May 30, 1997. *Id.* at 64-65. Hardy appealed to the First DCA, assigned case number 1D97-2558, and that court affirmed the case without an opinion on March 17, 1998. <u>Hardy v. State</u>, 709 So. 2d 539 (Fla. 1st DCA 1998). The mandate issued April 28, 1998. Doc. 17 Ex. O.

On October 28, 1998, Hardy filed a petition for writ of habeas corpus in the First DCA, assigned case number 1D98-4109. Doc. 17 Ex. P. The First DCA denied the petition on January 12, 1999. *Id.* Ex. Q. <u>Hardy v. State</u>, 731 So. 2d 653 (Fla. 1st DCA 1999).

On or about June 22, 1999, Hardy filed his first federal habeas corpus petition. Doc. 17 Ex. R. This Court denied the petition, assigned case number 4:99cv244-WS, by order filed April 17, 2001, finding the petition untimely. *Id.* Exs. U, V; *see id.* Ex. T

(Report and Recommendation).  This Court and the Eleventh Circuit Court of Appeals

denied a certificate of appealability.  *Id.* Exs. W, X.

On February 26, 2002, Hardy filed in the state trial court a motion for post-

conviction relief pursuant to Florida Rule of Criminal Procedure 3.800.  *Id.* Ex. Y at 1-34.

The court denied the motion by order rendered March 14, 2002.  *Id.* at 35.  On appeal,

assigned case number 1D02-3761, the First DCA affirmed without an opinion on

January 6, 2003.  *Id.* Ex. Z; Hardy v. State, 838 So. 2d 1150 (Fla. 1st DCA 2003).

Hardy filed a motion for rehearing, which the First DCA denied by order on February 20,

2003.  Doc. 17 Ex. AA.  The mandate issued March 10, 2003.  *Id.*  Hardy petitioned for

certiorari review in the U.S. Supreme Court, and his petition was denied on October 8,

2003.  *Id.* Exs. BB, CC.

On October 1, 2004, Hardy filed another Rule 3.800 motion in the state trial

court, which he later amended.  *Id.* Ex. DD at 1-52, 53-105.  The State filed a response

in which it conceded the first ground raised in Hardy's motion, which asserted the 30-

year sentence for attempted armed robbery with a firearm was illegal because that

offense is a second degree felony for which the maximum penalty is 15 years in prison.

*Id.* at 111.  The State also requested a pre-sentence investigation so that the State

could pursue sentencing Hardy as a violent habitual felony offender.  *Id.* at 112.  A

hearing took place on May 30, 2006.  *Id.* Ex. FF.  The court granted the Rule 3.800

motion in part and denied it in part.  Specifically, on the first count, the court

resentenced Hardy to 15 years, finding the original 30-year sentence illegal.  *Id.* Ex. FF

at 9.  The court denied the remainder of the motion, leaving the remainder of the

sentences as originally imposed, with all sentences still running concurrent.  *Id.* at 9-10.

The court entered a corrected judgment and sentence on May 30, 2006.  *Id.* Ex. EE at

135-41.

Hardy appealed and counsel was appointed, who filed briefs in First DCA case

number 1D06-3431.  *Id.* Exs. GG, II.  The State filed an answer brief, which conceded

that Counts 2, 3, and 4, all of which charged attempted felony murder, should have

been treated as first degree felonies and not reclassified as life felonies.  *Id.* Ex. HH.

The First DCA accepted the concession, and reversed and remanded the case for

resentencing in an opinion issued May 4, 2009:

> The State concedes the sentencing court erred in imposing life
> sentences for appellant Anthony Hardy's convictions for attempted felony
> murder.  The State's concession of error is both professional and correct.
> A sentencing court may not reclassify attempted felony murder, a first-
> degree felony, as a life felony on the basis of the defendant's use of a
> firearm, when the firearm use is an essential element of the underlying
> felony, as it was here.  *See Traylor v. State*, 785 So. 2d 1179, 1181 (Fla.
> 2000).  Accordingly, the case is remanded for resentencing with respect to
> appellant's attempted felony murder convictions.

*Id.* Ex. JJ; <u>Hardy v. State</u>, 8 So. 3d 486 (Fla. 1st DCA 2009).  The mandate issued June

1, 2009.  Doc. 17 Ex. KK.

On remand, the state trial court appointed counsel for Hardy.  *Id.* Ex. LL at 5-6.

The State filed a Notice of Intent to Seek Enhanced Penalty as Habitual Felony

Offender and/or Habitual Violent Felony Offender.  *Id.* at 7-8.  A resentencing hearing

took place on July 16, 2009, during which Hardy was represented by counsel.  *Id.* Ex.

MM.  In an order rendered July 16, 2009, the state trial court found Hardy a Habitual

Violent Felony Offender (HVFO).  *Id.* Ex. LL at 20-21.  In a judgment and sentence

rendered that same day, the court resentenced Hardy, as a HVFO, to 15 years in prison on Count 1, and to life in prison with the possibility of parole on Counts 2, 3, and 4, with the sentences to run concurrent, and with a 3-year minimum. *Id.* at 23-31.

Hardy again appealed to the First DCA. During the pendency of the appeal, assigned case number 1D09-3732, his counsel filed a Rule 3.800(b)(2) motion in the trial court on May 5, 2010. Doc. 17 Ex. OO at 87-95. A hearing took place on June 24, 2010. *Id.* Ex. PP. That same day, the trial court entered a new judgment and sentence on June 24, 2010, nunc pro tunc August 16, 1991, which restored the original 30-year sentence on Count 1, with a 10-year minimum, and with life sentences on the other counts, but with 15-year minimums, all sentences concurrent and imposed as HVFO. *Id.* Ex. OO at 99-108, Ex. PP at 12-15.

On August 4, 2010, Hardy filed another Rule 3.800(b)(2) motion. In an order rendered August 25, 2010, the trial court granted that motion, found it had no jurisdiction to resentence Hardy on Count 1 and, therefore, restored the 15-year non-HVFO sentence on that count, to run concurrent with the sentences on the other counts. Doc. 17 Ex. ZZ at 53.

On November 23, 2010, Hardy filed a third Rule 3.800(b)(2) motion. Doc. 17 Ex. QQ at 151-61. In an order rendered January 20, 2011, the trial court denied the motion. *Id.* at 162-65.

On October 26, 2011, the First DCA affirmed without a written opinion. *Id.* Ex. UU; Hardy v. State, 73 So. 3d 763 (Fla. 1st DCA 2011). The mandate issued November 14, 2011. Doc. 17 Ex. VV. On March 1, 2012, Hardy filed a pro se Motion to

Take Judicial Notice/Motion to Reinstate Appellate Proceedings in the First DCA.  Doc.

17 Ex. WW.  The First DCA denied the motion by order dated July 5, 2012.  Hardy then

filed a petition for writ of mandamus in the Florida Supreme Court, which that court

denied on October 17, 2012.  *Id.* Exs. XX, YY; <u>Hardy v. State</u>, 104 So. 3d 1084 (Fla.

2012).

On December 1, 2011, Hardy filed a pro se motion to vacate sentence.  Doc. 17

Ex. ZZ at 1-25.  In an order rendered July 3, 2012, the state trial court denied the

motion.  *Id.* at 25-28.  Hardy appealed to the First DCA, assigned case number 1D12-

4311, and that court affirmed the case without a written opinion on November 27, 2012.

*Id.* Ex. BBB; <u>Hardy v. State</u>, 103 So. 3d 148 (Fla. 1st DCA 2012).  The mandate issued

December 27, 2012.  Doc. 17 Ex. CCC.

On January 24, 2013, Hardy filed another Rule 3.850 motion and supporting

memorandum.  Doc. 24 Ex. DDD at 1-38.  The state trial court summarily denied the

motion in an order rendered June 13, 2014.  *Id.* at 39-41.  The court also denied Hardy's

motion for rehearing.  *Id.* at 120-25 (motion), 126 (order).  Hardy appealed to the First

DCA, assigned case number 1D13-6056, but did not file a brief.  *See* online docket for

1D13-6056 at <u>www.1dca.org.</u>  The First DCA affirmed the case without a written opinion

on March 7, 2014.  Doc. 24 Ex. EEE; <u>Hardy v. State</u>, 134 So. 3d 952 (Fla. 1st DCA

2014).  The mandate issued April 2, 2014.  *See* online docket for 1D13-6056 at

<u>www.1dca.org.</u>

As indicated above, on March 19, 2013, Hardy filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254 in this Court.  Doc. 1.  He subsequently filed an

amended § 2254 petition.  Doc. 22.  Hardy raises five grounds, including claims of

ineffective assistance of counsel (IAC):

> (1) Hardy's HVFO sentence is illegal because it was imposed in violation of the 6th, 8th, and 14th Amendments to the U.S. Constitution and corresponding provisions of the Florida Constitution.  Doc. 22 at 6-7.

> (2) Trial Court Error and IAC – Hardy's convictions were obtained in violation of the 6th and 14th Amendments to the U.S. Constitution and Article 1, Sections 9 and 16 of the Florida Constitution where defense counsel did not object to the state trial court's failure to take judicial notice of the trial records review of the presentence investigation report and as much of the file as may be pertinent before resentencing Hardy on June 24, 2010.  *Id.* at 8-9.

> (3) Trial Court Error – The state trial court erred in allowing the in-court identification of Hardy by the alleged victim and in not suppressing a pretrial photo line-up.  *Id.* at 10.

> (4) Trial Court Error and IAC – The state trial court erred in allowing a conviction of a charge not authorized by federal law in violation of due process and both the federal and state Constitutions, and the convictions were obtained in violation of the 6th and 14th Amendments of the U.S. Constitution and Article 1, Sections 9 and 16 of the Florida Constitution where defense counsel failed to object and move the court to vacate the three convictions for attempted first degree felony murder and reduce the offense accordingly, because Hardy was charged with three counts of attempted first degree felony murder and, under the authority of State v. Gray, 654 So. 2d 552 (Fla. 1995), these are non-existent criminal offenses.  Doc. 22 at 11.

> (5) IAC – Defense counsel failed to object to improper comments by the prosecutor during opening statements.  *Id.* at 12-13.

Respondent has filed an answer and exhibits.  Docs. 17, 24.  Hardy has filed a reply.

Doc. 26.

## Analysis

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for

persons in state custody.  Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect
> to any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).  *See* Williams v. Taylor, 529 U.S. 362 (2000); Gill v. Mecusker,

633 F.3d 1272 (11th Cir. 2011).

If a state prisoner's habeas petition "includes a claim that has been 'adjudicated

on the merits in State court proceedings,' § 2254(d), an additional restriction applies."

Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).  The federal court may not grant

relief unless the state court's adjudication of the claim:  (1) resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal

law, as determined by the Supreme Court of the United States; or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).   "This is a

'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which

demands that state-court decisions be given the benefit of the doubt.'" <u>Cullen</u>, 131

S.Ct. at 1398 (quoting <u>Harrington v. Richter</u>, 131 S.Ct. 770, 786 (2011), and <u>Woodford</u>

<u>v. Visciotti</u>, 537 U.S. 19, 24 (2002)).  This Court's review "is limited to the record that

was before the state court that adjudicated the claim on the merits." <u>Cullen</u>, 131 S.Ct.

at 1388.

Also relevant here, in <u>Strickland v. Washington</u>, the U.S. Supreme Court adopted

a two-part test for ineffective assistance of counsel (IAC) claims:

> First, the defendant must show that counsel's performance was deficient.
> This requires showing that counsel made errors so serious that counsel
> was not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment.  Second, the defendant must show that the deficient
> performance prejudiced the defense.  This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable.

466 U.S. 668, 687 (1984).  To demonstrate ineffectiveness, a "defendant must show

that counsel's performance fell below an objective standard of reasonableness." *Id.* at

688.  To demonstrate prejudice, a defendant "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." *Id.* at 694.  "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.*  For this Court's purposes,

importantly, "[t]he question 'is not whether a federal court believes the state court's

determination' under the <u>Strickland</u> standard 'was incorrect but whether that

determination was unreasonable – a substantially higher threshold.'" <u>Knowles v.</u>

<u>Mirzayance</u>, 556 U.S. 111, 123 (2009) (quoting <u>Schiro v. Landrigan</u>, 550 U.S. 465, 473

(2007)).  "And, because the <u>Strickland</u> standard is a general standard, a state court has

even more latitude to reasonably determine that a defendant has not satisfied that standard." *Id.* It is a "doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard." *Id.*

### <u>Ground 1</u>: HVFO Sentences on Counts 2, 3, and 4

In his first ground, Petitioner Hardy asserts his HVFO sentences on Counts 2, 3, and 4 are illegal because the State waived HVFO sentencing at the original sentencing, and thus the state court imposed these sentences in violation of the 6th, 8th, and 14th Amendments to the U.S. Constitution, and "corresponding Florida Constitution." Doc. 22 at 6. Specifically, Hardy argues that "the trial judge and the State had both waived the right to impose an enhanced HVFO sentencing enhancement because the Petitioner exercised his due process right to correct his illegal sentence." *Id.* at 7. Hardy argues that "absent the HVFO enhancement, which the trial court waived its right to impose at the original sentencing proceeding, the trial court was without legal authority to apply the HVFO enhancement and impose a life sentence on counts 2, 3, and 4." *Id.*

Hardy raised this HVFO waiver argument, through counsel, in a Rule 3.800(b)(2) motion filed November 23, 2010. Doc. 17 Ex. QQ at 154-58; *see* Doc. 22 at 7-8; Doc. 24 at 11. The state trial court rejected the claim, making the following findings:

> The State originally filed a notice of intent to seek an enhanced penalty under sec. 775.094 on Aug. 9, 1991. *Exh. 1 - 8/9/91 Notice.* At the initial sentencing shortly thereafter, the State requested an HVFO sentence on the attempted robbery charge, but advised it would not request an enhanced sentence on the attempted murder counts because of a recently-certified question as to whether an enhanced sentence could be imposed on certain convictions. *Exh. 2 - 8/16/91 Sentencing*

*Transcript, p. 6.* The Court did not impose habitual offender status on any of the convictions at that time, explaining that it was "not because I believe that the request is unreasonable, but because I believe there may be a procedural problem here . . . and that is that we did not order a pre-sentence investigation and I don't know that the defendant has waived that." *Exh. 2, p. 8.* On June 18, 2009, the State filed a notice of intent to seek an enhanced HVFO or HFO penalty at the resentencing on the attempted murders mandated by the appellate court. *Exh. 3 - 6/18/09 Notice.* At the July 16, 2009, resentencing, the Court in a separate proceeding determined that Defendant qualified as an HVFO, and at the most recent resentencing on June 24, 2010, Defendant and the State stipulated to, and the Court took judicial notice of, the previous evidence of HVFO status. *Exh. 4 - 7/16/09 Order for Imposition of Sentence as HVFO; transcripts of the two sentencing hearings are included as part of the appellate record.*

The State has consistently sought enhanced sentencing under the habitual violent felony offender statute, and the original sentencing Court did not "waive" the imposition of such a sentence as Defendant asserts. The cases cited by Defendant in support of this allegation are distinguishable in that they involve trial courts which initially decided not to find habitual offender status after considering the State's request and presentation of evidence. *Grimes v. State*, 616 So. 2d 996 (Fla. 1st DCA 1992); *Martinez v. State*, 625 So. 2d 1306 (Fla. 3d DCA 1993). Because this constitutes an "acquittal" of the habitual offender sentence, the trial courts were precluded from later imposing a habitual offender sentence on remand. *Id.*; *see also Spencer v. State*, 739 So. 2d 1247 (Fla. 1st DCA 1999) (trial court could not sentence defendant as habitual offender after revocation of community control where defendant was not originally sentenced as habitual offender). In the instant case, the original sentencing Court did not consider the issue of whether it was appropriate to sentence Defendant as a habitual offender and then expressly elect not to do so, but rather never reached the issue because of a perceived procedural bar. Thus, there was no acquittal or subsequent double jeopardy violation.

As to Defendant's claim that the imposition of the HVFO sentences, after he was originally sentenced to guidelines sentences, illegally increased his sentences and violated double jeopardy, a harsher sentence may be imposed on resentencing when the original sentence is found to be illegal. *Duhart v. State*, 930 So. 2d 654 (Fla. 3d DCA 2006); *Plute v. State*, 835 So. 2d 368 (Fla. 2d DCA 2003).

Accordingly, the imposition of a habitual offender sentence was not waived at the original sentencing, and the habitual violent felony offender sentences were properly imposed upon resentencing.

Doc. 17 Ex. QQ at 163-65. On appeal, the First DCA affirmed without an opinion.

These rulings are entitled to AEDPA deference and review is limited to the record before the state court. *See* 28 U.S.C. § 2254(d); <u>Cullen</u>, 131 S. Ct. at 1402; <u>Richter</u>, 131 S. Ct. at 784-85; <u>Wright</u>, 278 F.3d at 1255.

The record supports the findings of the state court that the State consistently sought enhanced sentencing under the habitual violent felony offender statute and did not "waive" the imposition of such a sentence. *See* Doc. 17 Ex. A at 37-38 (Notice of Intent to Seek Enhanced Sentence (Violent Habitual Felony Offender), filed August 9, 1991); Ex. F (transcript of sentencing hearing held August 16, 1991); Ex. LL at 7-8 (Notice of Intent to Seek Enhanced Penalty as Habitual Felony Offender and/or Habitual Violent Felony Offender, filed June 18, 2009), 20-21 (Order for Imposition of Sentence as Habitual Violent Felony Offender, rendered July 16, 2009); Ex. MM (transcript of resentencing hearing held July 16, 2009); Ex. PP (transcript of rensentencing hearing held June 24, 2010). In particular, at the original sentencing hearing on August 16, 1991, the trial judge, Philip J. Padovano, made the following statements in imposing the sentence:

> All right. Well first of all, I'm not – Mr. Hardy, I have considered your statement that you don't know anything about this crime, but I'm sure you understand that the jury has found you guilty of all of these crimes and I'm obligated now to pass sentence based on that finding of guilt.
>
> As for the State's request, I'm not going to impose habitual felony offender status in this case, not because I believe that the request is

unreasonable, but because I believe there may be a procedural problem here at sentencing today and that is that we did not order a pre-sentence investigation and I don't know that the defendant has waived that.

My assumption was that we could proceed to sentencing in this case and that the habitual felony offender status would make little difference, given the defendant's sentencing guidelines score, with what we expected it to be at that time.

And, of course, that is correct with respect to three out of the four charges, but apparently not as to the fourth. But I'm concerned that by imposing that at this pont all I would be doing is adding needlessly to the litigation that will occur in this case without any significant benefit to the State.

I do think that – I do think that a life sentence is warranted in this case. I've considered the defense request to impose a lower sentence. But I can't imagine under these set of facts that I would be justified in imposing a lower sentence. In fact, I wish to tell you, Mr. Hardy, I'm greatly disturbed by the racial implications of this case and because of the actions – because of your actions I would impose a harder sentence but there is no greater sentence that can be imposed in this case but life.

But I want you to know that I would impose a more serious sentence because of that if I were able to do it. So there being no legal cause why sentence should not be imposed, I've previously adjudicated you guilty of all of these offenses. I now sentence you to life in prison in Count II, III, and IV, and and [sic] thirty years in prison on Count I, all to run concurrent.

Doc. 17 Ex. F at 8-9.

On June 18, 2009, for the resentencing hearing for Counts 2, 3, and 4, held on

remand from the First DCA, the State filed another Notice of Intent to Seek Enhanced

Penalty as Habitual Felony Offender and/or Habitual Violent Felony Offender. *Id.* Ex. LL

at 7-8. The state trial court determined, in a separate proceeding, that Hardy qualified

as an HVFO. *Id.* at 20-21. At the sentencing hearing on July 16, 2009, Judge P. Kevin

Davey sentenced Hardy, as a HVFO, to life in prison, with the possibility of parole, on

those three counts:

> Well, I've read the file over and I mean I certainly appreciate that
> Mr. Hardy was a young man, I mean, that was 20 years ago almost.  Let's
> see, it was '91 and this is '09, but it was a horrendous crime.  And what
> I'm trying to do here is put myself in Judge Padovano's shoes, because he
> tried the case and I didn't.  I did a resentencing, as Mr. Hardy said, back in
> '06, on another issue, a correction of an error early on or in the interim I
> should say.

> So I am not going to sentence him under the guidelines, I mean,
> that would be a 17 to 40 year sentence.  And if I gave you 40 years, I
> believe he would stay longer than if I gave him life subject to parole.  So
> he's got a better chance of being out, plus he would be on parole which
> then that would give me the comfort and I think the community the comfort
> that he has turned his life around and he is going to become a productive
> member of society because that's what we all are, for you, Mr. Hardy.

> So in Case 91-33CFA, I will sentence him on the three attempted,
> and I think that's the only ones that are really in effect here. . . .

> Two, three, and four.  I will resentence him to life in prison,
> however, with parole.  I will sentence him as a – I do find there's no
> dispute about it, that it is a habitual violent felony offender.  I will sentence
> him as such.  And so I will sentence to life in prison but with the right of
> parole.

*Id.* Ex. MM at 16-17.

The last resentencing occurred on June 24, 2010, before Judge Kathleen

Dekker.  *Id.* Ex. PP.  In response to the judge's statement that "if there was going to be

an objection to that [to the State's evidence regarding HVFO status] then the State

needed to be well advised so they would know to go through the whole thing again, and

that it's not a problem taking judicial notice," Hardy's counsel stated, "Mr. Hardy and I

both were present back in July of 2009 and feel confident the same conclusion would be

drawn." Doc. 17 Ex. PP at 3. The judge concluded, "Okay. So that predicate was met."

*Id.* After hearing from both counsel and from Hardy, Judge Dekker imposed the

sentence:

> THE COURT: All right. I have given careful thought, independent judgment to the case. And I realize there's been other judges on it, but I do appreciate the fact that this is what they call a de novo sentencing. And I do have a responsibility to exercise independent judgment and I have done so.
>
> I find that the defendant is a habitual violent felony offender and does meet the statutory qualification. That as to whether he should be classified an HVFO, I do find that it is permissible and that it is appropriate to do so. So I do classify him as such. . . . As to Counts 2, 3, and 4, life with mandatory minimum of 15 years. . . .
>
> . . . .
>
> THE DEFENDANT: Life? I just got life? Life?
>
> THE COURT: Yes. My opinion is these are extremely serious, serious crimes, and I think it's appropriate and a fair sentence. If there's to be mercy, I think it's going to have to come, if there's no ability – in other words, if the law's not tampered with to change it in your favor then the Governor, but that may be your only hope. Or sometimes when people are advanced aged, they go ahead and make special provisions. But I don't know, I'm not making any assumptions about it. It's just that those may be possibilities. I mean, as far as I know, you know, for a long time life has meant life, so in my opinion if you do less than life, you're lucky.
>
> THE DEFENDANT: I would like to point out when the State filed the notice of intent to seek habitual, right? Up under 775.84(3)(a) it states that prior to imposing the life sentence, to find me guilty as a violent habitual felony offender, that a separate hearing also would be held. It also states that the defendant shall receive copies of the notice of intent and his –
>
> THE COURT: Well, we talked about that. Your attorney has indicated, and they all stipulated that the predicate for that – to, in other words, stipulate to all the evidence and admissions that were earlier done. And I've read, we've got that transcribed and the admissions were made.

*Id.* at 11-14.

Moreover, to the extent this ground claims any trial court error in imposing an

HVFO sentence, it does not warrant federal habeas relief as "federal habeas corpus

relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990);

*see* Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (explaining errors that do not infringe

on defendant's constitutional rights provide no basis for federal habeas corpus relief).

"A state's interpretation of its own laws or rules provides no basis for federal habeas

corpus relief, since no question of a constitutional nature is involved." Carrizales v.

Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983); *accord, e.g.*, McCullough v.

Singletary, 967 F.2d 530, 535 (11th Cir. 1992).

Based on the foregoing, Hardy has not shown the state court's rejection of his

claim was either (1) contrary to, or involved an unreasonable application of, clearly

established U.S. Supreme Court precedent, or (2) based on an unreasonable

determination of the facts in light of the evidence presented in the state court

proceeding. *See id.*; 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

### <u>Ground 2</u>: Trial Court Error and IAC – Court's Failure to Take Judicial Notice of Presentence Investigation Report and File before Resentencing

In his second ground, Hardy asserts the state trial court failed "to take judicial

notice of the trial records review of the presentence investigation report and as much of

the file as may be pertinent before re-sentencing" him on June 24, 2010. Doc. 22 at 8.

Hardy asserts that at no time did he waive his right to the benefit of a presentence

investigation as required by Florida law. *Id.* at 8-9; *see* § 775.084(3), Fla. Stat. (1991)

[check this § cite]. Hardy also appears to assert a claim of IAC in connection with this ground, by asserting his "trial counsel failed to object to the court's failure to take judicial notice." Doc. 22 at 8.

Hardy argues the state court violated state law in sentencing him without a presentencing investigation. As with Ground 1, to the extent this ground claims trial court error, it does not warrant federal habeas relief. *See, e.g.*, <u>Lewis</u>, 497 U.S. at 780; <u>Estelle</u>, 502 U.S. at 67-68; <u>Carrizales</u>, 699 F.2d at 1055. Moreover, as explained in the analysis of Ground 1, *supra*, at the sentencing hearing on June 24, 2010, defense counsel stated, "Mr. Hardy and I both were present back in July of 2009 and feel confident the same conclusion would be drawn" concerning the court's finding that he qualified as for sentencing as an HVFO. Doc. 17 Ex. PP at 3.

To the extent this ground claims IAC, Hardy raised it as the first claim in his Rule 3.850 motion submitted to the state court January 2013. Doc. 24 Ex. DDD at 4. In denying the claim, the state post-conviction trial court made the following findings:

> In support of claim (1), Defendant argues that, upon a *de novo* re-sentencing by a successor judge, that judge must thoroughly review the pre-sentence investigation form and other documents, so as to acquaint him or herself with the facts of the case. Despite Defendant's allegations, the re-sentencing hearing transcript establishes that the judge took ample time to familiarize herself with the facts of the case before imposing sentence. Regardless, no reasonable probability exists that had counsel taken the actions at issue, the outcome of the proceeding would have been different.
>
> A review of the record reveals the truly heinous facts of Defendant's crimes in this case, and although a prior judge's statements are not binding in a *de novo* re-sentencing or in the instant order, the Court notes that all three judges to enter a sentence have commented in some way on their egregious nature. *Exh. 1; Exh. 3 – Trial transcript, pp. 164-90; Exh. 4*

> *– 8/16/1991 Sentencing hearing, pp. 9-11; Exh. 5 – 5/30/2006 Re-*
> *sentencing hearing upon motion to correct illegal sentence; Exh. 6 –*
> *7/16/2009 Re-sentencing hearing on remand.* Indeed, the Honorable
> Judge Padovano, having heard the evidence at trial, expressed his desire
> to impose a sentence *greater* than life imprisonment. *Exh. 3 4.* For each
> and all of the foregoing, Defendant's claim fails.

*Id.* at 40. On appeal, the First DCA affirmed without an opinion. These rulings are
entitled to AEDPA deference and review is limited to the record before the state court.
*See* 28 U.S.C. § 2254(d); Cullen, 131 S. Ct. at 1402; Richter, 131 S. Ct. at 784-85;
Wright, 278 F.3d at 1255.

The record supports these findings. Specifically, as detailed in the analysis of
Ground 2, *supra*, all three judges reviewed the case and acknowledged the serious
nature of the crimes before imposing sentence.

Based on the foregoing, Hardy has not shown the state court's rejection of his
claims was either (1) contrary to, or involved an unreasonable application of, clearly
established U.S. Supreme Court precedent, or (2) based on an unreasonable
determination of the facts in light of the evidence presented in the state court
proceeding. *See id.*; 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

## Ground 3: Trial Court Error – In-Court Identification and Failure to Suppress Line-up

In his third ground, Hardy asserts the state trial court erred by allowing the in-
court identification of him by the alleged victim and by not suppressing a pretrial
photographic line-up. Doc. 22 at 10. Hardy explains, "The local Sheriff's department
showed the victim in this cause a photographic line-up which consisted of 3 separate 6

pack photographic line-ups which contained only one photograph matching the description of the light-bearded gunman described by the victim." *Id.*

As both Hardy and Respondent indicate, Hardy raised this claim as the first point in his direct appeal. Doc. 17 Ex. G-2 (Initial Brief); *see* Doc. 22 at 10; Doc. 24 at 14. Prior to trial, defense counsel had filed a motion in limine, seeking to prohibit the State from eliciting an in-court identification of Hardy by one of the victims, Victor Patel, because "[t]he photo lineup was unduly suggestive." Doc. 17 Ex. A at 17. Initially, a hearing took place before Judge Charles D. McClure and, after listening to argument and testimony, the judge found the photo lineup "was not suggestive and it was not overreaching," the victim "had a close opportunity to observe the defendant across the counter several feet away, within five feet away," and [h]e was shown a lineup at random without any suggestion as to – he had given a description and the deputy had prepared three different lineups, eighteen total pictures in bunches of six, so . . . the identification or the lineup was proper and it was not suggestive." *Id.* Ex. C at 73 (transcript of hearing held July 30, 1991). After a hearing de novo held the day of the trial, outside the presence of the jury, the trial judge, Philip Padovano, also denied the motion and made findings on the record:

> Okay. I'm going to deny the motion to suppress. I don't think – I think that there was – I don't think there was anything wrong with the procedure that was employed. In fact, it seems to me that it was quite fair. What the officer attempted to do was to make separate photo spreads each of which contained photographs as close as possible to the photographs of the suspect who was the primary suspect in that photo pack. And while it's true that not all of these contain pictures of people with beards or light beards, all of the people in the photo pack with the defendant, that being number or letter "B," all of them do have beards.

I notice also that the description that was given by the victim to the police officer was someone around his height, five-nine or five-ten. Every single person in this photo spread is approximately five-nine or five-ten. You can't tell that from looking at the photos but they're all standing up next to a height measurement bar. There is only one person here who seems to be over that, number three is closer to six feet, but everybody else is about five-ten.

They are all black. They all appear to be between twenty and thirty, or perhaps some of them a little older than thirty maybe. It's true – they all have beards. It's true that some are lighter than others, but there are a few other people in here who could be described as having light beards. So we can't expect the officers to find photographs of five people who look exactly like the defendant. That's not the point of this.
He did use people that were as close as possible under the circumstances. I discount the victim's testimony that some of these photos look different. At this point I am sure that if he is truly picking out the person who truly pointed a gun at him, that person will look different from every other person in the world now. I don't care how many photographs you put next to it, he's always going to stand out. At this point, his opinion about it means very little.

My own opinion about it is that these photographs are relatively similar and that the procedure that was used here is fair. Now it's also a commentary on the fairness of the overall procedure that the officer shuffled the pictures before he showed the second photo pack to the victim's wife. She didn't pick anybody out. I presume she is not going to identify anybody during the trial but I think that is a material point because it does go to show the general fairness of the procedures that the officer employed in this case.

Given the opportunity that the victim had to observe the defendant, I doubt that there is little chance – well first of all, I don't find there was any suggestivity or any suggestion I should say, maybe that's an easier way to say it, in the way this was done. So I'm not sure I'm even required to go to the second step. But even if I were, I don't think there is a substantial likelihood of misidentification because of the opportunity the victim had to observe the defendant. So for all of those reasons, I agree with the disposition made earlier by Judge McClure and I will deny your motion to suppress.

Doc. 17 Ex. D at 134-37.

In his initial appellate brief, through counsel, Hardy argued the trial court erred in

allowing the in-court identification and not suppressing a pretrial photographic line-up.

Doc. 17 Ex. G-2 at i, 11, 12-14.  Specifically, Hardy cited <u>Stovall v. Denno</u>, 388 U.S. 293

(1967), <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972), and <u>Manson v. Brathwaite</u>, 432

U.S. 98, 110 (1977), and made the following argument:

> In the case before the court the victim, Victor Patel, had described
> the gunman as being approximately 5'9'' tall, medium build, short hair, and
> having a light beard.  (RII. 48-49).  Several days later he is showed a
> photographic line-up containing eighteen separate photographs divided
> into three groups.  The Appellant's picture was contained in the second
> group of pictures.  Victor Patel picked out photograph number five, the
> photograph of the Appellant.  (RII. 47).  During cross-examination Mr.
> Patel stated that out of the photographs that he was shown all of the
> individuals depicted had heavy facial hair and Mr. Hardy's photograph
> showed facial hair which was significantly lighter than the others. (RII. 51).
> During his trial testimony and over the objections of the Appellant the
> witness testified that in his opinion only two of the photographs used in the
> photographic line-up showed people with light facial hair.  (RIII. 189).
> When asked if the group of pictures looked more or less alike the witness
> responded "no."  (RIII. 190).  A review of the pictures used in the
> photographic line-up shown to Victor Patel clearly indicates that the
> Appellant's picture stands out among the rest because of the different
> shades of facial hair depicted in the photographs.  As such it can not be
> said that the photographs each fit the description of the alleged gunman.
> Using this series of photographs, only one of which contained the
> photograph of a man with light facial hair, constitutes an unnecessarily
> suggestive photographic line-up.  It would seem to be obvious that if you
> were robbed by a man with very light facial hair and were shown a series
> of photographs only one of which depicted a man with light facial hair it
> would be fairly easy to select that photograph as the man you're looking
> for.  In this cause the procedure used by the Gadsden County Sheriff's
> Department was so unnecessarily suggestive as to give rise to a
> substantial likelihood of irreparable misidentification as prohibited by the
> United States Supreme Court in the cases outlined above.  As such the
> trial court should have granted the Appellant's motion to suppress the out-
> of-court photographic line-up identification and should have prohibited the
> State from introducing the testimony of Victor Patel related to any in-court
> identification of the Appellant.  This is an error of constitutional magnitude

> and should result in the Appellant's conviction being reversed and his
> cause remanded for a new trial.

*Id.* at 13-14.  The First DCA affirmed without an opinion.  This constitutes a ruling on the

merits entitled to AEDPA deference, and review is limited to the record before the state

court.  *See* 28 U.S.C. § 2254(d); <u>Cullen</u>, 131 S. Ct. at 1402; <u>Richter</u>, 131 S. Ct. at 784-

85; <u>Wright</u>, 278 F.3d at 1255.

This ground rests on the state trial court's evidentiary ruling, "and like all

evidentiary rulings, there is a significant difference between an evidentiary error and a

denial of due process."  <u>Rembert v. Tucker</u>, No. 4:09cv387-SPM/MD, 2012 WL

4344455, at *6 (N.D. Fla. Aug. 22. 2012).  "A pretrial identification may amount to a due

process violation if the pretrial procedure was 'unnecessarily suggestive and conducive

to irreparable mistaken identification.'"  *Id.* (quoting <u>Stovall v. Denno</u>, 388 U.S. 293, 302

(1967); *see* <u>Manson</u>, 432 U.S. at 98; <u>Biggers</u>, 409 U.S. at 188; <u>Simmons v. United

States</u>, 390 U.S. 377, 383-84 (1968).  If the procedure used was unduly suggestive,

then the court must determine whether, under the totality of the circumstances, the

identification was reliable.  <u>Biggers</u>, 409 U.S. at 199.  Those circumstances include:

> [1] the opportunity of the witness to view the criminal at the time of the
> crime, [2] the witness' degree of attention, [3] the accuracy of the witness'
> prior description of the criminal, [4] the level of certainty demonstrated by
> the witness at the confrontation, and [5] the length of time between the
> crime and the confrontation.

*Id.* at 199-200.

In this case, the state trial court found as fact that the photographic line-up was

not impermissibly suggestive.  Hardy has not produced clear and convincing evidence

to rebut this finding.  28 U.S.C. § 2254(e).  Although the photo lineup itself does not

appear in this record, from the statements in the transcript of the hearing, this Court

cannot say that the lineup was unnecessarily suggestive.  The state trial court

specifically found, as fact, that although not all of the photos depicted subjects "with

beards or light beards," all the subjects in photo pack "B," which contained Hardy's

photo, did have beards.  Doc. 17 Ex. D at 134-35.  The court further found that every

subject in the photo spread was black and was approximately 5'9" or 5'10" tall, with the

exception of one subject who was closer to 6' tall.  *Id.* at 135.  The court found that all

the subjects appeared to be between 20 and 30 years old, "perhaps some of them a

little older than thirty maybe."  *Id.*  The judge opined that "these photographs are

relatively similar and that the procedure that was used here is fair."  *Id.* at 136.

Testimony in the record supports the state trial court's findings.  Sergeant James

Hindman, from the Gadsden County Sheriff's Department, testified during the motion

hearing that he showed the group of photo line-ups to the victim, Victor Patel, on

January 7, 1991, approximately four days after the crime.  Doc. 17 Ex. D at 98, 101.

Sergeant Hindman testified that he put the photo line-ups together based on the

description given by Mr. Patel of the perpetrator:  black male, 20 to 25 years old, height

about 5'8" to 5'10."  *Id.* at 100, 103, 115-16.  He also included suspects with facial hair

because information from a confidential informant had suggested that Hardy could be

the perpetrator, and when the sergeant looked at Hardy's picture, he had facial hair.  *Id.*

at 116-17; *see id.* at 108.  Sergeant Hindman did not point in any way or suggest who

Mr. Patel should pick.  *Id.* at 99.  Sergeant Hindman handed the closed packet to Mr.

Patel and Mr. Patel had to open the packet to look at the arrays, in three groups marked A, B, and C. *Id.* at 99, 102. Mr. Patel did not pick anyone from the first or third array. *Id.* at 99, 102. Mr. Patel recognized someone in the second array, marked as "B," and identified #5 of that group. *Id.* at 100, 102. The sergeant testified that Mr. Patel "was very positive" that the person in #5 was the perpetrator. *Id.* at 101.

The victim, Victor Patel, also testified at the motion hearing. *Id.* at 118- He testified that he lives in Quincy and runs a little grocery store called Pat's Grocery. *Id.* at 118. He testified that on the night of January 3, 1991, at approximately 9 p.m., he was the victim of an attempted robbery during which a gun was held to him, his wife was shot, and Dimple Patel was shot. *Id.* at 118. He testified that two black males entered the store and one approached the cash register, with an ice cream and a soda water. *Id.* at 119-20. That individual then reached in his pocket, pulled out a gun, and pointed it at him. *Id.* at 119. Mr. Patel testified the store had good lighting and he was positive that Hardy was the individual who pulled the gun. *Id.* at 120. Mr. Patel testified: "He pointed it at me and then turned towards Dimple and shot Dimple and then he turned again at me and tried to shoot but it didn't fire. At that time, I ran inside" to get his shotgun. *Id.* at 120-21. By the time he returned, the shooter was gone. *Id.* at 121. Mr. Patel had not seen Hardy before that night. *Id.* Mr. Patel testified that on January 7, 1991, Sergeant Hindman brought him some photo line-ups; the deputy did not point to anything or tell him any names. *Id.* Mr. Patel did not recognize anyone in groups "A" or "C," but he did see a face in group "B" that looked familiar. *Id.* at 122-23. Mr. Patel selected #5 in group "B." *Id.* at 123. Mr. Patel testified, "The face I would recognize . . .

[b]ecause he shot my wife and he tried to shoot me, too." *Id.* at 124. (Mr. Patel also testified during the trial and identified Hardy as the man who tried to rob the store, tried to shoot him, and who shot his wife and Dimple Patel. *Id.* at 170-85, 191.)

Because the record supports the state trial court's conclusion that the photo lineup was not impermissibly suggestive, the <u>Biggers</u> reliability factors do not come into play. <u>Biggers</u>, 409 U.S. at 196-98; *see, e.g.*, <u>Cikora v. Dugger</u>, 840 F.2d 893, 897 (11th Cir. 1988) (concluding that photo lineup was not impermissibly suggestive where, among other things, all men in lineup had some facial hair). Even considering the <u>Biggers</u> factors and the totality of the circumstances – particularly the witness's opportunity to view the criminal at the time of the crime, the witness's degree of attention, and the level of certainty demonstrated by the witness – the record supports the state court's finding that the identification was reliable.

Hardy has not shown that any state court ruling rejecting this ground resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

<u>**Ground 4**</u>**: Trial Court Error and IAC – Attempted Felony Murder**

In his fourth ground, Hardy asserts the trial court erred by allowing his conviction for attempted felony murder, a non-existent offense under <u>State v. Gray</u>, 654 So. 2d 552 (Fla. 1995). Doc. 22 at 11. Hardy also asserts his counsel rendered ineffective assistance by failing to move the court for a reduction of sentences for these convictions

during resentencing or to vacate the convictions for these offenses and have a new trial.

*Id.*

Hardy raised this as the second claim in his Rule 3.850 motion submitted to the

state court January 2013. Doc. 24 Ex. DDD at 10. In denying the claim, the state post-

conviction trial court made the following findings:

> As for claim (2), Defendant acknowledges that he was previously procedurally barred from bringing a *Gray* claim, but argues that his conviction and sentence did not become final until the mandate affirming his June 2010 re-sentencing issued on November 14, 2011. This argument is meritless. Although Defendant's new sentences permitted him to bring Rule 3.850 claims regarding the re-sentencing proceeding, his convictions of the crimes at issue were final as of the February 23, 1993 First DCA mandate, and have remained undisturbed since that date. Moreover, as Defendant concedes, *Gray* is not retroactive. *See State v. Woodley*, 695 So. 2d 297, 298 (Fla. 1997).

*Id.* at 41 (footnote omitted). In a footnote, the court distinguished state cases relied on

by Hardy:

> The Court is mindful of Defendant's reliance on *Snipes v. State*, 843 So. 2d 1043 (Fla. 2d DCA 2003) and *Oliver v. State*, 734 So. 2d 1083 (Fla. 1st DCA 1999) in support of his argument that he had standing to bring a *Gray* claim. Those cases are distinguished by virtue of the fact that those defendants were re-sentenced upon remand from a direct appeal. In Defendant's case, he was re-sentenced on remand from the partial denial of his February 3, 2005 motion to correct illegal sentence pursuant to Florida Rule of Criminal Procedure 3.800(a). *Exh. 7 – Motion*; *Hardy v. State*, 8 So. 3d 1150 (Fla. 1st DCA 2009).

*Id.* On appeal, the First DCA affirmed without an opinion. These rulings are entitled to

AEDPA deference and review is limited to the record before the state court. *See* 28

U.S.C. § 2254(d); <u>Cullen</u>, 131 S. Ct. at 1402; <u>Richter</u>, 131 S. Ct. at 784-85; <u>Wright</u>, 278

F.3d at 1255.

As the state court explained, Hardy's conviction was final, under Florida law, as of the date of the mandate following the affirmance of his direct appeal, on February 23, 1993. *See, e.g.*, Falcon v. State, 162 So. 3d 954, 960 (Fla. 2015) (explaining that when Florida Supreme Court issues decision favorable to criminal defendants, that decision applies "'in all cases to convictions that are not yet final – that is convictions for which an appellate court mandate has not yet issued'" and "once a conviction is final, the State acquires an interest in the finality of the conviction" (quoting Hughes v. State, 901 So. 2d 837, 839 (Fla. 2005))). Over two years later, on May 4, 1995, the Florida Supreme Court issued its decision in State v. Gray, receding from the holding in Amlotte v. State, 456 So. 2d 448 (Fla. 1984), that there was a common law criminal offense of attempted felony murder in Florida, and abolishing that crime in Florida, reasoning that the "legal fictions required to support the intent for felony murder [were] simply too great" to extend to attempted felony murder. State v. Gray, 654 So. 2d 552, 554 (Fla. 1995). That decision, however, was not retroactive and specifically applied only to cases "pending on direct review or not yet final." *Id.* at 554; *see* State v. Woodley, 695 So. 2d 297, 298 (Fla. 1997) (expressly holding that "Gray does not apply retroactively to those cases where the convictions had already become final before the issuance of the opinion"). In another decision, the Florida Supreme Court explained "attempted felony murder was a valid offense, with enumerated elements and identifiable lesser offenses,

for approximately eleven years" and "[i]t only became 'nonexistent' when we decided Gray." State v. Wilson, 680 So. 2d 411, 412 (Fla. 1996).[2]

Because Hardy's conviction was final under Florida law prior to the Gray decision, that decision did not apply to his case. *See, e.g.*, Walker v. State, 715 So. 2d 1065 (Fla. 2d DCA 1998) (explaining criminal judgment of conviction for attempted felony murder became final upon issuance of appellate court's mandate in direct appeal on August 1, 1994, before Gray decision). Attempted felony murder was a valid crime in Florida at the time of Hardy's offense, trial, and direct appeal. His counsel was not ineffective for failing to raise a meritless argument. *See, e.g.*, Chandler v. Moore, 240 F.3d 907 (11th Cir. 2001). *See also* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

Hardy has not shown that any state court ruling rejecting this ground resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

---

[2]Notably, in the year following the Gray decision, the Florida Legislature created the offense of "felony causing bodily injury," enacting section 782.051, Florida Statutes. Coicou v. State, 39 So. 3d 237 (Fla. 2010); *see* ch. 96-359, § 1, at 2052, Laws of Fla. In 1998, the Florida Legislature rewrote section 782.051 and retitled it "attempted felony murder." Coicou, 39 So. 3d at 240; *see* ch. 98-204, § 12, at 1970, Laws of Fla. Thus, in Florida, "attempted felony murder is specifically provided for by statute." Coicou, 39 So. 3d at 240; *see* § 782.051(1), Fla. Stat. (2001).

## <u>Ground 5</u>: IAC – Failure to Object to Comments by Prosecutor

In his fifth ground, Hardy asserts defense counsel rendered ineffective assistance by failing to object to improper comments by the prosecutor during opening statements.  Doc. 22 at 12-13.  Hardy asserts that, during opening statements, the prosecutor "actually created a new version of the Petitioner's alleged in-custody statements, to wit: 'Shut up, bitch, if I am sentenced in this case, I'll kill – I'll shoot me two crackers just like the ones I'm charged with.' (Simultaneously making a gun with his finger and pulling the trigger)."  *Id.* at 12.  Hardy asserts that "not only was the statement an incorrect statement, but also a statement that amounted to a confession that the Petitioner did not make" and defense counsel did not make a contemporaneous objection and move for a mistrial or a curative instruction.  *Id.*

As Respondent indicates, Hardy challenged the prosecutor's statements in Ground 8 of his first Rule 3.850 motion, filed in state court on August 9, 1994.  Doc. 17 Ex. L at 28-29; *see* Doc. 24 at 21.  As part of his argument there, Hardy asserted, that the prosecutor's statements "having been given to the jury, prior to the court having ruled on its admissibility, should have been objected to by the defense attorney."  Doc. 17 Ex L at 29.  In an order rendered February 14, 1996, the state post-conviction trial court denied the ground, explaining it was not "the proper subject[] of a Rule 3.850 motion inasmuch as [it] involve[s] [a] question[] of law or fact already decided on appeal, <u>Gore v. State</u>, 260 So. 2d 218 (Fla. 1st DCA 1972), or that could have been raised on appeal, <u>Straight v. State</u>, 499 So. 2d 530 (Fla. 1986)."  *Id.* at 62.  Hardy appealed the summary denial of this Rule 3.850 motion to the First DCA but he did not file a brief.

*See* online docket for 1D96-905 at www.1dca.org.  The First DCA per curiam affirmed the case without a written opinion.  <u>Hardy v. State</u>, 680 So. 2d 427 (Fla. 1st DCA 1996).

Assuming Hardy has exhausted this ground, or demonstrated cause and prejudice for any procedural default, this ground lacks merit.  In federal habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637 (1974)).  The comments must have been improper and have rendered the trial fundamentally unfair.  <u>United States v. Eyster</u>, 948 F.2d 1196, 1206 (11th Cir. 1991).  A review of this record, explained in detail *infra*, indicates the prosecutor's comments concerned statements the trial court ruled admissible by denying the defense motion to suppress.  Thus, the comments did not rise to such a level as to result in an unfair trial or deprivation of due process.  *See* <u>Darden</u>, 477 U.S. at 181 (finding that prosecutor's comments "undoubtedly were improper," but that was not enough for habeas corpus relief as the question was whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

In particular, Hardy takes issue with comments the prosecutor made in his opening statement, which the prosecutor attributed to Hardy:

> In addition, you will also have for your consideration tomorrow a statement that the defendant made on the 7th of February, 1991, while he was at the Gadsden County Jail and Corrections Officer Joyce Ivory, when the defendant was making a ruckus, he told her to – . . . Mr Hardy told Corrections Officer Joyce Ivory something to the effect of, "Shut up, bitch.

If I am sentenced in this case I'll kill – I'll shoot me two crackers just like
the ones I'm charged with," put his finger out and went, "bang, bang,"

Doc. 17 Ex. D at 158-59.  Defense counsel did not object at this point.  *See id.* at 159;

*see also id.* Ex. E at 173-74 (prosecutor's closing argument reference to statements

Hardy made to Officer Ivory).

Defense counsel had filed, however, a pretrial motion to suppress these

statements, which Judge McClure denied after a hearing on July 30, 1991.  *Id.* Ex. D at

91-92; *see id.* Ex. C at 73-74 (Judge McClure's ruling on the record at conclusion of

hearing on motions: "As to the statement made to then Corrections Officer Ivory, this,

even though the defendant was in custody, it was not a custodial interrogation.  It was

an extemporaneous and voluntary statement given by the defendant. . . . So I find that –

I will deny the motion to suppress . . . as to the statements that were testified to by

Corrections Officer Ivory . . . .").  On the day the trial started, just before jury selection,

the following exchange occurred among counsel and the trial judge, Judge Padovano:

> THE COURT: . . . Now with regard to the motion in limine, moving right
> along here, you had a motion in limine before Judge McClure?
>
> MR. SMITH [prosecutor]: To suppress an out-of-court indentification.
>
> MR. HOGENMULLER [defense counsel]: The photo line-up.
>
> MR. SMITH: The photo lineup.  Judge McClure denied that.  And there
> was a motion in limine as to two statements the defendant made to
> representatives of the law enforcement community while he was in jail
> shooting his mouth off, in essence.
>
> THE COURT: Okay.  Well my – of course, I'm not bound by Judge
> McClure's rulings in these matters, and I think in any event the defense
> has an obligation to renew these objections before the testimony is
> presented.  So I will consider those issues.  I think for you to do this right,

Mr. Hogenmuller, you have to re-present them anyway, because they won't be preserved for you simply by making a motion. And I'm not permitted to the idea of following Judge McClure's ruling. I have no idea what the issues are.

MR. HOGENMULLER: Would you want to hear the witnesses again?

THE COURT: Well, I don't know the best way to handle it. What I was going to suggest that we do, since we have a jury waiting, is to simply at this point express to you my desire to accept Judge McClure's ruling, whatever it might be at this stage of the game.

Your obligation to renew objections would not come until the point of the trial in which evidence is actually admitted. So except that he could refer to it – do you plan to refer to the –

MR. HOGENMULLER: My desire was to put it on the record at the start before we started, to renew my motions at that time.

THE COURT: You still have to preserve it when it comes in. Well your renewed motion then is denied right now.

MR. HOGENMULLER: Okay.

THE COURT: When it comes in, I will hear it again. Is this something that has to be mentioned to the jury? I mean, if it is, you can mention it to the jury and if I grant the motion we will have a mistrial. That's all. . . . Well, in essence then, what in essence you might as well say your motion is granted for now through the end of voir dire. . . . Actually what I'm doing is denying it and reaffirming Judge McClure's ruling. But I think we all agree the best thing to do is lay off the subject until we have a chance to review it during trial.

Doc. 17 Ex. D at 13-16. After jury selection, when defense counsel raised the issue just

prior to the start of trial, Judge Padovano explained:

Well, the difficulty here is while I'm not required to accept Judge McClure's ruling on the pretrial motion, there is nothing that requires me to completely re-do the hearing either. I think you are not only entitled to renew the objection but required to at the point in the trial where the evidence is going to come in. And I think that's probably what we ought to do is simply send the jury out and I'll give the – even though if I had been

the same trial judge it may not amount to anything more than simply a formal renewal of the motion.

In this case, since it's a different trial judge, I think what I'll do is hear it again at that point.

*Id.* Ex. D at 92-93.  Defense counsel expressed concern that "if this case ends up on appeal, being told that we didn't preserve it properly" for the record and his "understanding is that I need to preserve it at the start, get a ruling, and then preserve it again at the time it comes up if I'm denied my ruling."  *Id.* at 93.  Judge Padovano stated:

That's correct.  But that doesn't entail anything more than simply objecting to the testimony at or right before it comes in and then the trial judge can determine whether in the context of the evidence, as it is actually presented, the ruling would be any different.  That's all it is.

What I'm saying is that in this case I would be willing to hear it all over again but I'm not willing to presume that Judge McClure was wrong and disrupt the whole sequence of the trial here.  So when it comes, if you want to go ahead, we'll send the jury out and I'll listen to it again, or I'll have it ruled on again.  I will be listening to it for the first time. . . . I think I should respect the rulings that Judge McClure made, at least until it comes time for me to reconsider them.

*Id.* at 93-94.  The judge further stated:

And as far as the statement in the jail is concerned, the only thing that is at risk here is that if you refer to it in your opening statement and subsequently it's excluded from evidence, then you have a potential mistrial situation.

. . . .

Well, until we get to the point of actually renewing consideration of Judge McClure's rulings, those rulings stand.  And so you're certainly free to discuss this in opening statement.  I'm sure you understand what the risk of that is if the ruling is changed.

*Id.* at 94-95. Defense counsel confirmed Judge Padovano's directive:

> MR. HOGENMULLER [defense counsel]:  Okay.  I just want to make sure I understand what our posture is then.  I've renewed the motion both to suppress the two statements . . . and I've renewed the motion in limine to suppress the testimony of the victim, Patel.  Now you're sustaining Judge McClure's denial in essence as far as the statements are concerned at this point, with my right to renew them at the time they come?

> THE COURT: That's right.

*Id.* at 95.

During the second day of trial, outside the presence of the jury, a hearing took place on the suppression of the statements made to Officer Ivory, who was employed by the Gadsden County Sheriff's Department at the Gadsden County Detention Facility at the time of the statements.  Doc. 17 Ex. E at 51-52.  Officer Ivory testified that she came into contact with Hardy at the Gadsden County Jail on the afternoon of February 7, 1991.  *Id.* at 53.  Hardy was in a confinement cell and he was the only person in there.  *Id.* at 54.  Officer Ivory had placed him in the cell; she never questioned him.  *Id.* She testified:

> A. . . . . It wasn't even a conversation.  Basically, you know, he was yelling and – . . . . He was in this confinement cell and when I say confinement it's a cell with a tray door on it and it was open at the time and he was kneeled down at it.  I had my back to him when he was talking.  But he was yelling out, you know, cursing and everything.  And I turned around and told him to stop, you know, making all those threats because the captain had just talked to us before we put him in there told him if he has any more trouble that he was going to get automatically thirty days in confinement.

> And he told me – when I was trying to get him to calm down he was like, "Fuck you, bitch."  He said, "I tell you what, If I go to court," – and while he was saying this I had my back to him.  But he said, "If I go to court and I get sentenced, I'm going to kill me – I'm going to kill me

somebody just like I did those other two white crackers." And when he said that, I turned around and like and he went, he smiled and said, "Bang, bang," just like that.

Q Did he use the word, he would kill the crackers or like he would kill the crackers or shoot the crackers?

A He will shoot the crackers like he did the other two, like he did the other two.

Q Okay. And you say when he went – what did he do with his fingers?

A He did like this, basically what most people would think like a gun. He even did his thumb like that.

Q Okay. And when he did that with his thumb, what did you do? Were you looking at him?

A Yes. Because when he made the statement it like dawned on me what he was charged with and I turned around – see, I didn't know anything about the case really. And when he said that I turned around and I was like two people was involved, I thought maybe one person was involved. I didn't know nothing about it. But as he finished his statement, the captain walked in and I told him, I said, "Captain Sullivan, he is so stupid," which is my personal opinion but I told him how stupid it was for him to just – that's a confession. And then the captain said, "Write me an incident report," and I wrote one.

Q You didn't ask him any questions or try to get a rise out of him or anything like that at any investigator's request?

A No. I hadn't even talked to an investigator. I wasn't even involved in the case or anything.

*Id.* at 54-56.

Hardy also testified during the motion hearing. *Id.* at 61. He testified he was put

in confinement because he was kicking on the door. *Id.* He further testified:

I can't recall – I think it was February 7th, I was sitting in confinement room, I was sitting there to the door, squatting down to my door. As I'm sitting out to my door, I'm looking out to the booking area and I see her

and Sergeant Jimmy Hindman out there behind the booking desk talking, you know. I heard Jimmy Hindman told Joyce Ivory to come to me to get information out of me, you know, to help them with their case.
And so, you know, I said – I laughed. I started laughing as he's walking off, Sergeant Hindman was walking off. So after he leaves, Joyce Ivory comes to my cell. She said, "Boy, you're in a whole lot of trouble." I said, "I know it." I said, "I'm being charged with something I haven't been charged – with something I ain't do." And so she said, "Out of all, they ain't got nobody but you." I said, "Yeah, that's true." So she said, "Why don't you tell me who else was involved in this case and I'll have them picked up and she wouldn't tell them that I told them." That's when I said, I said, "Bitch, I ain't telling you shit. Go tell them crackers that." I said, "I ain't telling you shit because I heard Jimmy Hindman tell you to come to me to get information out of me."

*Id.* at 62-63. Hardy testified he did not make the statement Officer Ivory testified to and

he did not point his finger at her like a gun. *Id.* at 63.

Defense counsel argued the statements should be excluded because "[i]t is a

violation of Miranda safeguards" and "the leading case is Rhode Island vs. Innis," at 100

S. Ct. 1682, 446 U.S. 289 (1980), which stated the Miranda safeguards apply whenever

a person is subjected to either express questioning or its functional equivalent. *Id.* at

65. Defense counsel argued that "we had custodial – he was in custody, he was

obviously a suspect in the crime, he had been arrested for the crime and it is our

contention that Deputy Ivory in effect was questioning him, baiting him into a response,

either the response that he says he made or the response that she says he made,

which is an incriminating one, one that deals with the offense alleged here" and "for

those reasons her testimony is tainted and should be excluded as to this matter." *Id.* at

65-66. The judge denied the motion:

All right. Well to the extent that you have moved to exclude the evidence, or to suppress the evidence of the statement, I deny the motion.

The difference in the testimony between Deputy Ivory and the defendant as to what was said is immaterial for the reasons I have previously given [that the issue is whether the evidence is admissible, not the credibility of the evidence. *Id.* at 59]. That is simply a matter for the jury to determine.

The difference in the testimony between Deputy Ivory and the defendant as to how it came to be that the statement was made might support your argument, except that I accept as true the testimony that Deputy Ivory gave and reject as untrue the testimony that the defendant gave. So since I make a factual finding which undermines the legal basis for your argument, I deny your motion.

*Id.* at 66. The jury then returned and Officer Ivory testified substantially as she did during the motion hearing. *Id.* at 67-74; *see id.* at 72-73 (Deputy Ivory's trial testimony that Hardy "went like, 'Fuck you, bitch.' He said, 'I tell you what, if I go to court I'm going to shoot me a cracker just like I did those other two crackers.' And I went – and then he went, 'Bang, bang,' just like that."). Hardy also testified at trial and his testimony included his version of this incident and statements he made to Officer Ivory. *Id.* at 103-05.

Based on the foregoing, defense counsel did not render ineffective assistance by not objecting to the prosecutor's opening statements about what Hardy told Officer Ivory. A review of the record reflects that defense counsel preserved his objection to the statements and to Judge McClure's ruling at the start of trial. Doc. 17 Ex. D at 90-95. Defense counsel did not object during opening statements because the trial judge, Judge Padovano, had already "sustained Judge McClure's denial" of the motion to suppress those statements, with defense counsel having the right to renew the motion when the statements came in as evidence during the trial. *Id.* at 95. The prosecutor, in opening statement, was appropriately previewing the State's evidence, which included

these statements Hardy had made, albeit at the risk of a mistrial if the trial judge later ruled the statements inadmissible. Indeed, Judge Padovano had also directed that if he ruled during the trial, when Officer Ivory testified, that the statements were inadmissible, "then you have a potential mistrial situation." *Id.* at 94. As set forth above, the trial judge heard the motion to suppress just before Officer Ivory's trial testimony, and he denied the motion, making a credibility finding concerning what led to Hardy's statement – that Officer Ivory did not question or bait Hardy. Thus, defense counsel did challenge the statements and repeatedly renewed objections before and during trial; however, the court ruled against the defense. This does not amount to ineffective assistance of counsel.

Hardy has not shown that any state court ruling rejecting this claim resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d)(1)-(2). This ground should be denied.

## Conclusion

Based on the foregoing, Petitioner Anthony Lamar Hardy is not entitled to federal habeas relief. The amended § 2254 petition (Doc. 22) should be denied.

## Certificate of Appealability

Case No. 4:13cv137-RH/CAS

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted).  Therefore, the Court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

Leave to appeal in forma pauperis should also be denied.  See Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** Petitioner Hardy's amended § 2254 petition (Doc. 22).  It is further **RECOMMENDED** that a

certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be

**DENIED**.    The Clerk shall substitute Julie L. Jones as Respondent.

IN CHAMBERS at Tallahassee, Florida, on October 15, 2015.

S/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.